UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOSE S. GARCIA,

                Plaintiff,

      -against-                          1:10-cv-01092 (LEK/DRH)

NEW YORK RACING ASSOCIATION,
INC.; PETER GOULET; CHUCK DWYER;
RICHARD KOCH; DAVID SMUCKLER;
INTERNATIONAL BROTHERHOOD of
ELECTRICAL WORKERS, LOCAL
UNION 3,

                Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

      On September 13, 2010, Jose S. Garcia ("Plaintiff" or "Garcia") filed this action alleging

various civil rights violations pursuant to 42 U.S.C. §§ 1981 and 1983, as well as unlawful

employment discrimination in violation of 42 U.S.C. § 2000e-2 ("Title VII") and the New York

Human Rights Law (N.Y. Executive Law § 296 (McKinney 2011)) ("NYHRL"), and unlawful

retaliation in the course of his employment in violation of New York Common Law.  Complaint

(Dkt. No. 1) ¶ 1.  Garcia's Complaint names six Defendants, including: the New York Racing

Association, Inc. ("NYRA"); Peter Goulet, a facilities manager at the Saratoga Race Course

("Goulet"); Chuck Dwyer, supervisor of the barn crew ("Dwyer"); Richard Koch, one of Plaintiff's

managers ("Koch"); David Smuckler, Senior Vice-President for Human Resources of NYRA

("Smuckler") (collectively, "NYRA Defendants"); and the International Brotherhood of Electrical

Workers, Local Union 3 ("Defendant IBEW" or "the Union").  Id. ¶¶ 10-15.  Plaintiff seeks

damages in accord with the provisions of N.Y. Exec. Law § 296, including back pay, front pay, compensation for the emotional harm he has suffered, and all reasonable attorneys' fees. Id. ¶¶ 139-40, 179. Plaintiff also seeks punitive damages, claiming that Defendants acted with malice and/or reckless disregard of his civil rights. Id. ¶¶ 141-42.

Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") on September 10, 2009, stating that he was "discriminated against at his place of employment because he is Mexican." Id. at ¶ 3. The NYSDHR concurrently filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") on Plaintiff's behalf. Id. On July 14, 2010, NYSDHR dismissed the complaint for administrative convenience, and on July 29, 2010, the EEOC issued a notice of the right to bring suit. Id. ¶¶ 4-5.

Now before the Court are NYRA Defendants' Motion to dismiss Plaintiff's Complaint with respect to Plaintiff's First Amendment claim brought under 42 U.S.C. § 1983, and Defendant IBEW's Motion to dismiss Plaintiff's Complaint with respect to all claims against the Union. Dkt. Nos. 21, 23. Plaintiff has filed an Opposition to these Motions and Defendants have filed Responses thereto. Dkt. Nos. 30 ("Opposition"); 31 ("NYRA Response"); 32 ("IBEW Response"). For the reasons discussed below, NYRA Defendants' Motion is granted, and Defendant IBEW's Motion is denied.

## II.     BACKGROUND

### A. Defendant New York State Racing Association ("NYRA")

Defendant NYRA was formed on September 12, 2008, under the New York State Not-For-Profit Corporation Law § 402 and the Racing, Pari-Mutuel Wagering and Breeding Law § 201 ("Racing Law"). Certificate of Incorporation, Def. NYRA Ex. B (Dkt. No. 21-1) at 27-33. On that

same date, NYRA's predecessor, the former New York Racing Assocation ("the former NYRA"),

entered into a State Settlement Agreement with the State of New York ("the State"), whereby the

former NYRA conveyed its right, title, and interest in the racetrack properties to the State in

exchange for $105,000,000.[1]  State Settlement Agreement ("Settlement Agreement"), Def. NYRA

Ex. D (Dkt. No. 21-1) § 2.4.

On September 12, 2008, the State also entered into a Franchise Agreement with NYRA

pursuant to Racing Law § 206.  Def. Ex. E (Dkt. No. 21-1) ("Franchise Agreement").  Under the

Franchise Agreement, NYRA possesses the

> right and responsibility to manage and operate all functions at the franchised racetracks
> including but not limited to . . . the hiring and management of racing secretaries, stewards,
> race officials, backstretch employees and other equine and racing related functions,
> establishing the purses, the stakes program and owner's relations, maintenance of the
> franchise racetracks and associated facilities, the selection of vendors for food, beverage and
> other concessions and other activities . . . .

N.Y. Racing Law § 206(1).  Furthermore, NYRA must pay the State an annual franchise fee equal

to the lesser of their adjusted net income and operating case.  Franchise Agreement § 2.4.  The

Franchise Agreement also authorizes the State to borrow itself and on behalf of NYRA to fund

capital improvements at any of the Racetracks.  Id. § 2.12(b).  Under the Franchise Agreement,

NYRA is not required to pay real estate taxes, that "being the sole and exclusive obligation and

responsibility of the State."  Id. § 2.14.  In the event the Franchise Agreement is terminated, all of

NYRA's rights, interests, and power will revert to the State.  Id. §§ 206(1), 210-a(4).

NYRA currently leases its property from the State, but is solely responsible for the payment

---

[1] Shortly after NYRA's incorporation, on November 2, 2006, the former NYRA filed for bankruptcy in federal district court pursuant to chapter 11 of title 11 of the United States Code. Settlement Agreement, Recital G, Dkt. No. 21-1 at 50.

of all "impositions, utilities, and operating expenses for the Racetracks."  Saratoga Race Course Ground Lease ("the Lease"), Def. NYRA Ex. F. (Dkt. No. 21-1) art. III.  Under the Lease, NYRA is obligated "to repair, alter, restore, replace and rebuild" the premises in the event of a casualty, and is solely responsible for performing and incurring the costs of "all maintenance, repair and upkeep of the Leased Premises, including the Improvements thereon."  Id. §§ 5.3, 11.2.

The State legislature also enacted a number of amendments or additions to the Racing Law that took effect concurrently with NYRA's reorganization under the Franchise Agreement, and are in large part incorporated into the Franchise Agreement.  See, e.g., Racing Law §§ 206-10, 212, 216; Franchise Agreement §§ 2, 5, 11; see also Pl. Ex. A (Dkt. No. 30) (chart outlining statutory changes following bankruptcy of former NYRA).  For instance, the Racing Law as amended grants the State Racing and Wagering Board the authority to schedule the dates and times of the races during which NYRA "may operate at the places and for the full number of days specified in its franchise."  N.Y. Racing Law § 208(7); Pl. Ex. A at 1.  The amendments also incorporated additional language requiring NYRA to adopt bylaws and codes to "ensure the franchised corporation is operated in an efficient and transparent manner, with the highest degree of integrity and is fully accountable to the people of the state of New York."  N.Y. Racing Law § 206(4).

Moreover, the statutory amendments, also incorporated into the Franchise Agreement, established a NYRA oversight board consisting of five members appointed by the governor.  Id. § 208-b; Franchise Agreement § 2.2, 2.3.  Each member serves a term of four years, and the governor must designate the chair of the board, who will serve at the governor's will.  N.Y. Racing Law § 208-b(1).  The board is "directed and is authorized to oversee, monitor and review all transactions and operations of a non-profit racing association."  Id. § 208-b(6).  This power includes assessment

-4-

and enforcement of NYRA's compliance with recommendations concerning: annual operating budget, operating revenues, accounting and security procedures, revenue and expenditure policies including collective bargaining agreements, vendor contracts and capital improvement plans, "performance standards," management and employee compensation plans, and governance principles for accountability and transparency.  Id.; Franchise Agreement § 2.2.  The board must report quarterly to the governor and legislature, and "shall utilize employees of the state racing and wagering board to carry out its duties."  N.Y. Racing Law §§ 208-b(9), (12).

NYRA is further required under the Racing Law to pay a percentage of the entire wagering pool and the total balance of any unclaimed winnings to the State Department of Taxation and Finance.  Id. §§ 238, 241.  The State Comptroller may also "from time to time examine the books and accounts" of NYRA, including anything relating to its financial operations, and must "report the results of each audit to the governor, the legislature, the attorney general, the franchise oversight board, and the state racing and wagering board."  Id. § 209.  Additionally, for security purposes, NYRA is authorized to appoint special policemen for security purposes and with the powers set forth in § 2.20 of New York Criminal Procedure Law.  Id. § 223.

**B. Plaintiff's Complaint**

Plaintiff worked for NYRA as a seasonal employee of the Saratoga Race Course in Saratoga Springs, New York, from 2001 until he was fired in August 2009.  Compl. ¶¶ 16-17; 59.  Plaintiff was a maintenance worker as a member of the barn crew from 2001 to 2008, and was promoted to a supervisory position for the 2009 season.  Id. ¶ 17; NYRA Defendants' Memorandum of law in support of motion to dismiss (Dkt. No. 21-2) ("NYRA Mem.") at 3.  Plaintiff states that while he

was a maintenance worker he only occasionally worked in the detention barn,[2] but that it became a regular task after he was promoted to supervisor.  Compl. ¶ 20.  Plaintiff claims that throughout eight years of employment at the race track, he did not receive any criticism or complaints about his work performance.  Id. ¶ 21.  Rather, Plaintiff alleges that he was a highly regarded worker by Charles Wheeler, a facilities manager; Mike Murray, a former foreman; and Joseph Strauss, Plaintiff's former supervisor.  Id. ¶¶ 24-25 ("Plaintiff's former supervisor, Joseph Strauss, said plaintiff was the best worker he had ever had.").

The events giving rise to this action began when the NYRA replaced the management team for the detention barn in 2009.  Id. ¶ 26.  At the beginning of the 2009 season, Plaintiff's hourly wage was $9.50, and after his promotion to supervisor that was increased to $11.50.  Id. ¶ 31.  Plaintiff asserts that his new supervisory position was previously held by a Caucasian Union-member employee with a grade of M-2, and that the previous supervisor was paid $23.00 per hour.  Id. ¶ 32.  Plaintiff further alleges that although he attempted to join the Union for three years, was promised that he would be given membership, and was recommended to the union by Joe Strauss, he was never awarded membership in the Union.[3]  Id. ¶¶ 33, 35.  According to Plaintiff, membership in the Union allows an employee to receive higher wages, health insurance, and an opportunity for a pension plan.  Id. ¶ 34.  Plaintiff states that there are no racial minority employees in the Union at Saratoga Race Course, but in 2009, two Caucasian male workers received Union membership at the same level at which Plaintiff was told he was eligible to join.  Id. ¶¶ 36-37.

---

[2] A detention barn is where race horses are kept prior to the beginning of the day's races to ensure no drugs are administered to the horses.  Compl. ¶ 30.

[3] For the first two years when he was denied membership, Plaintiff claims that no reasons were provided for the denials, and that in 2009 he was told he could not join for lack of a driver's license.  Compl. ¶¶ 33, 35.

Plaintiff further claims that some of his staff received higher wages than Plaintiff did, despite their shorter tenure and more limited experience.  Id. ¶ 42.

Approximately one week before Plaintiff was fired, he reported to security and to the integrity counsel[4] that there was "beer in the refrigerator in the break room and bottles of alcohol in the loft of the barn" in violation of the policy prohibiting all alcoholic beverages and drugs in the barn.  Id. ¶ 75.  Plaintiff claims that the investigators for the integrity counsel eventually found that Goulet was responsible for the infraction and that Goulet admitted to placing the alcohol in the barn. Id. ¶¶ 77-78, 155.  Goulet, however, is still employed with the race track.  Id. ¶¶ 77-78, 155.

Plaintiff asserts that one week following this incident, on August 24, 2009, he had become very sick on the job and had to leave.  Id. ¶¶ 79, 87-88, 155.  Plaintiff alleges that he attempted to call Goulet twice and Koch once to notify them that he was going home sick.  Id. ¶ 89.  Although neither answered Plaintiff's calls, Plaintiff alleges that he left messages for both Goulet and Koch. Id. ¶¶ 89-90.  Plaintiff also claims that an hour after he left work, Goulet allegedly returned Plaintiff's call and voiced consent to Plaintiff's leaving work.  Id. ¶¶ 92-93.  The Complaint states that approximately an hour and a half after Plaintiff left work on August 24, 2009, Koch informed an employee on Plaintiff's staff, that Plaintiff had been fired by Goulet.  Id. ¶ 94.  That employee subsequently informed Plaintiff that his employment was terminated.  Id. ¶ 96.

Plaintiff states that he contacted NYRA's investigators and integrity counsel after learning that he was fired.  Id. ¶ 98.  At a meeting with the counsel, on Wednesday, August 26, 2009, Plaintiff informed two investigators of the circumstances surrounding his firing.  Id. ¶ 100  The

---

[4] The integrity counsel is an statutorily-created, independent entity that is not subject to direct control by NYRA, but its sole purpose is to "ensure the integrity of the franchised corporation, its officers and employees, and it operations."  N.Y. Racing Law § 206(5).

investigators spoke to Koch, who said that he did not know whether Plaintiff was actually fired.  Id. ¶ 101.  Following the meeting with the integrity counsel, Plaintiff allegedly went to the maintenance office to speak with Goulet.  Id. ¶ 102.  Although Goulet was not there, Koch was, and he informed Plaintiff that he was fired and instructed him to turn in his keys and badge.  Id. ¶¶ 103-104.  Koch also allegedly told Plaintiff that he did not know why Plaintiff was fired, but that he would speak with Goulet.  Id. ¶ 105.  Plaintiff claims that he finally communicated with Goulet at the end of the day, and Goulet confirmed that Plaintiff was fired but provided no reason for the termination.  Id. ¶¶ 110-112.

Plaintiff states that on Thursday, August 27, 2009, he attended a meeting with Goulet, Smuckler, a woman named Chrystal,[5] Koch, and two women Plaintiff did not know, where his employment termination was confirmed.  Id. ¶¶ 113-114.  The reason provided for his termination was "job abandonment," because he had left work on August 24, 2009, without informing anyone and did not attend work the following day.  Id. ¶ 115.  One of the women stated that Plaintiff did not know he had been fired on August 24, and therefore should have attended work the next day.  Id. ¶ 117.  Plaintiff accused them of lying, and Smuckler allegedly became angry and said to Plaintiff: "You CAN speak English!"  Id. ¶ 118.  On September 10, 2009, Plaintiff filed a complaint with the NYSDHR.[6]

---

[5] The Complaint does not make clear who "Chrystal" is or what position if any she holds at NYRA.  Plaintiff identifies her only as a friend, and later in the Complaint alleges that she is currently supporting him while he is unemployed and that this has caused strain in their relationship.  Compl. ¶¶ 88, 132.

[6] In addition to the claims addressed in Defendants' Motions and this Order, Plaintiff also claims that he suffered racial discrimination in violation of § 1981 and experienced a hostile work environment in violation of Title VII and New York law.  Compl. ¶¶ 15-16, 17-19.  For a more complete statement of Plaintiff's claims, reference is made to the Complaint.

## III.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a district court must accept as true all well-pleaded factual allegations made by the non-moving party, and "draw all inferences in the light most favorable" to the non-moving party.  In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).  "The issue is not whether plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) (quoting Weisman v. LeLandais, 532 F.2d 308, 311 (2d Cir. 1976)).  Any legal conclusions, deductions, or opinions couched as factual allegations are not accorded a presumption of truthfulness.  See Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1951-52 (2009).  If a plaintiff provides well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 1949.  In order to survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atlantic Corp. v. Twombly, 500 U.S. 544, 570 (2007)).  A case should not be dismissed unless the court is "satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief."  Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).

## IV. DISCUSSION

NYRA Defendants move to dismiss Plaintiff's Complaint pursuant to FED. R. CIV. P. 12(b)(6) with respect to the allegations brought under 42 U.S.C. § 1983 because Plaintiff did not plead a violation of his constitutional right to freedom of speech, and because he did not plead that NYRA is a state actor capable of acting under color of state law.  See NYRA Mem. at 6, 9.

Defendant IBEW moves to dismiss Plaintiff's Complaint with respect to all claims against the Union pursuant to FED. R. CIV. P. 12(b)(6), on the grounds that Plaintiff has not stated a plausible claim for relief for his discrimination claims and that IBEW was not named as a party in his administrative complaint.  See Def. IBEW Memorandum in support of motion to dismiss (Dkt. No. 23-1) ("IBEW Mem.") at 3.

### A. § 1983 Claim Against NYRA Defendants

Section 1983 empowers a district court to grant relief to a party whose constitutional rights were violated by a state or local official or anyone acting under color of state law.  Washington v. County of Rockland, 373 F.3d 310, 315 (2d Cir. 2004) (citing Parratt v Taylor, 451 U.S. 527, 535 (1981); Eagleston v. Guido, 41 F.3d 865, 875 (2d Cir. 1994)).  "To establish a constitutional violation under § 1983, plaintiffs must demonstrate that (1) defendants were acting under color of state law at the time of the alleged malicious . . . [action]; and (2) the action was a deprivation of a constitutional or federal statutory right."  Washington, 373 F.3d at 315.

Plaintiff alleged in his Complaint, without pointing to any cases in support of this claim, that "[t]he federal courts have held that NYRA is a state actor subject to the requirements of the United States Constitution."  Compl. ¶ 151.  Plaintiff further claims that the termination of his employment violated his right to freedom of speech because Plaintiff was speaking as a public citizen when he reported that there were alcoholic beverages in the detention barn and that his speech was a matter of public concern.  Id. ¶¶ 152-157.

### 1. Acting Under Color of State Law

"[T]o be subject to suit under § 1983, the alleged infringement of federal rights must be 'fairly attributable to the State.'"  Stevens v. N.Y. Racing Ass'n, 655 F. Supp. 164 (E.D.N.Y. 1987)

(quoting <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 838 (1982)). "State action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.</u>, 531 U.S. 288, 295 (2001) (quoting <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 351 (2001)). "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." <u>Brentwood Acad.</u>, 531 U.S. 295-96.

The Supreme Court has established two tests for determining whether alleged misconduct is fairly attributable to the state under § 1983.  First, under the "nexus" test, a plaintiff must show that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." <u>Jackson</u>, 419 U.S. at 351.  The second test, the "symbiotic relationship" test, requires a showing that the state "has so far insinuated itself into a position of interdependence with the [regulated entity] that it must be recognized as a joint participant in the challenged activity." <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. 715, 725 (1961); <u>see also</u> <u>Myron v. Consol. Rail Corp.</u>, 752 F.2d 50, 54 (2d Cir. 1985). Unlike the nexus test, the symbiotic relationship test "does not require that the plaintiff demonstrate that the state was involved in the challenged conduct." <u>Stevens</u>, 665 F. Supp. at 164 (citing <u>Myron</u>, 752 F.2d at 54).  Plaintiff's Complaint has failed to state any facts supporting an inference that state officials participated in the conduct of which he complains.  Plaintiff therefore must satisfy the symbiotic relationship test to demonstrate that NYRA's actions were "fairly attributable to the State." <u>See</u> <u>Stevens</u>, 665 F. Supp. at 171-172 (holding that the "nexus" test is inapplicable because

the record did not indicate that state officials actually participated in the alleged violation, and that the "symbiotic relationship" test must be used); see also Alvarez v. Hayward, 1:06-cv-745, 2006 WL 2023002, at *3 (N.D.N.Y. July 18, 2006).

### a. Rule 8 Pleading Requirements

As a threshold matter, NYRA Defendants argue that Plaintiff has not provided sufficiently well-pleaded factual allegations that NYRA is a state actor. See NYRA Mem. at 9-10. Plaintiff states that NYRA "is a not-for-profit association with an exclusive franchise from New York State to conduct horse racing and pari-mutuel betting at the Aqueduct, Belmont Park and Saratoga racetracks." Compl. ¶ 10. In further support of his claim that NYRA as a state actor, Plaintiff's Complaint states only that "[t]he federal courts have held that NYRA is a state actor subject to the requirements of the United States Constitution." Id. ¶ 151. The Complaint makes no reference or citation to any specific federal case holding that NYRA is a state actor. Id. ¶ 151.

NYRA argues that the cases referenced by Plaintiff may not be incorporated by reference, citing to Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), in which the Second Circuit has held that "limited quotation" of certain documents "does not constitute incorporation by reference." NYRA Mem. at 10; Goldman, 754 F.2d at 1066. In Goldman, the Second Circuit held that if the district court wished to consider those documents, it was required to convert the motion to one for summary judgment. 754 F.2d at 1066. However, this holding was based on the fact that the documents considered by the district court in ruling on a motion to dismiss were not part of the complaint, were submitted by the defendants, and prejudiced the plaintiff because the plaintiff had had no opportunity to respond to them. See id. The Second Circuit in Goldman concluded that converting the motion to one for summary judgment ameliorated this prejudice by affording the

plaintiff an opportunity to respond to the documents submitted by the defendants.  See id.

Unlike the plaintiff in Goldman, Plaintiff has had the opportunity to respond and indeed done so; in his Opposition, he cites the same cases addressed by Defendants in their Motion to support his position that NYRA is a state actor, and explains that in writing his Complaint he "had no reason to believe that NYRA, having lost the State actor issue in many cases, and having conceded it in many cases, would argue lack of State action here."  Pl.'s Memorandum of law in opposition to motions to dismiss (Dkt. No. 30-1) ("Pl. Mem.") at 8-12 (citing Alvarez v. Hayward, 2006 WL 2023002; Stevens, 655 F. Supp. at 164).  Likewise, the Court considers that Plaintiff and Defendants address the same cases in the Motion and Opposition addressing the issue of whether NYRA is a state actor; this suggests that Plaintiff's Complaint was sufficient to put NYRA Defendants on notice as to what Plaintiff intended to allege with respect to the state action issue. See Goldman, 754 F.2d at 1066; but see United States v. Bonnano Org. Crime Family of La Cosa Nostra, 683 F. Supp. 1411, 1434 (E.D.N.Y. 1988) (finding criminal complaint in RICO case insufficient where government merely cited previous judicial decision against defendant and questioning "the sufficiency of merely citing a judicial decision in a complaint as a means of incorporating the facts stated in the decision by reference").  Neither party will be unduly prejudiced if the Court considers the cases cited by both Defendants in their Motion and by Plaintiff in his Opposition.  Cf. Goldman, 754 F.2d at 1066.

Based on the above, the Court concludes that Plaintiff's reference in his Complaint to federal cases finding NYRA a state actor constitutes a sufficient factual allegation to plead the requisite element of state action here.  However, the cases on which Plaintiff relies are no longer binding because they applied to the former New York Racing Association, Inc. ("the former NYRA").  The

Court must therefore address whether NYRA today meets the requirements of the symbiotic relationship test as stated above.

### b. Symbiotic Relationship Test

As noted above, to establish state action under the symbiotic relationship test, a plaintiff must show that the state "has so far insinuated itself into a position of interdependence with the [regulated entity] that it must be recognized as a joint participant in the challenged activity." Burton, 365 U.S. at 725.

Both federal district courts and New York state courts consistently held that the former NYRA was a state actor under § 1983.  See Galvin v. New York Racing Ass'n, 70 F. Supp. 2d 163, 173 (E.D.N.Y. 1998) ("The property interest in these state-issued licenses cannot be infringed by a state body, including the NYRA, without affording due process of law."); Stevens, 665 F. Supp. at 172; Alvarez, 2006 WL 2023002, at *3 (adopting reasoning of the court in Stevens and finding the former NYRA to be a state actor); Saumell v. New York Racing Ass'n, 58 N.Y.2d 231, 237 (N.Y. 1983) ("NYRA concedes for the purposes of this proceeding that its exclusion of petitioner constitutes 'State action.'"); Halpern v. Lomenzo, 367 N.Y.S. 2d 653 (N.Y. Sup. Ct. 1975) ("The State has so far insinuated itself into a position of interdependence with [NYRA] . . . that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so purely private as to fall without the scope of the Fourteenth Amendment.") (quoting Burton, 365 U.S. at 725).

Defendants argue that the reasoning in these cases is flawed and urge the Court to follow instead the reasoning of the district court in Murphy v. New York Racing Ass'n, 76 F. Supp. 2d 489 (S.D.N.Y. 1999), which found that the Stevens court should have but failed to consider whether

"profits earned by discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a government agency."  NYRA Mem. at 11-14 (quoting Murphy, 76 F. Supp. at 494-497).  Because the plaintiff in Murphy had failed to allege that the profits earned by the defendants in that action, the former NYRA Board of Trustees ("Board defendants"), were such indispensable elements, the court found that she had failed to sufficiently allege the existence of a symbiotic relationship necessary to establish state action.  Murphy, 76 F. Supp. at 496.

However, as the court in Murphy also noted, the Board defendants in that case were sued in their individual and not their official capacities; thus, the plaintiff's claim against them would have failed even if she had sufficiently alleged that a symbiotic relationship existed between NYRA and the State of New York.  Id. at 496-97.  Furthermore, the court granted the Board defendants' motion to dismiss in that action, but permitted the case against the former NYRA to proceed.  See id.; Alvarez, 2006 WL 2023002, at *3.  At least one other district court has also distinguished Murphy on these grounds in finding that the former NYRA was a state actor.  Alvarez, 2006 WL 2023002, at *3.  The Court likewise finds this distinction persuasive and concludes that Murphy is inapposite here.

Nonetheless, because NYRA has been reincorporated subsequent to those decisions, the question of whether it shares a symbiotic relationship with the State warrants reconsideration. Defendants allege that NYRA is independent from the State of New York as a private not-for-profit corporation.  NYRA Mem. at 4.  Plaintiff not only points to the earlier cases discussed above holding that NYRA is a state actor, but also argues that through the statutes enacted as part of the reorganization of NYRA, the State has actually "increased its control over NYRA."  Pl. Mem. at 14.

Based on the above review of the Franchise Agreement and the relevant provisions in the

-15-

New York Racing Law, the Court finds that the State is sufficiently intertwined with NYRA's management to support a finding of a symbiotic relationship between the two.  Although earlier federal court decisions addressed the former NYRA only, the recent Franchise Agreement and amendments to the Racing Law that have been enacted since Stevens and Alvarez further evince a symbiotic relationship between NYRA and the State, including: the State's imposition of an oversight board for NYRA, the transfer in responsibility for scheduling races to the State, and the grants of authority to the State both to borrow from itself on behalf of NYRA to fund capital improvements at any of the racetracks, and to audit NYRA's books and accounts at its discretion. N.Y. Racing Law §§ 208-09; Franchise Agreement § 2.12(b).  These new powers and responsibilities have increased the State's involvement with and control over NYRA, and bolster the conclusion that a symbiotic relationship exists between the two entities.

Moreover, the relationship between NYRA and the State confers significant benefits on both.  NYRA, for instance, is not required to pay taxes on the land on which it operates, and may appoint special policemen for security purposes (a power typically reserved for cities and states). See Stevens, 665 F. Supp. at 173.  The State also benefits financially from its relationship with NYRA, as NYRA is required to pay the State a percentage of the entire wagering pool and the total balance of any unclaimed winnings to the State Department of Taxation and Finance.  N.Y. Racing Law §§ 238, 241.  The Franchise Agreement also gives the State all reversionary interests in NYRA. Franchise Agreement §§ 206(1), 210-a(4).  This cannot be considered a typical franchise agreement between a private actor and the State.  See Stevens, 665 F. Supp. 164 (finding requirement that NYRA pay franchise fee to the State supported finding of symbiotic relationship); cf. Rendell-Baker, 457 U.S. at 832 (finding no symbiotic relationship existed between school and state where

-16-

school was founded as a private institution, and was operated by a purely private board of directors).

Taking into consideration both the "variety of mutual benefits" this arrangement affords NYRA and

the State, and the State's obligations and responsibilities towards NYRA, the Court finds that a

symbiotic relationship exists sufficient to render NYRA a state actor under § 1983.  Burton, 365

U.S. at 724.

Furthermore, Plaintiff is suing the individual NYRA Defendants in their official capacities,

alleging that his termination became the "official policy" of NYRA when it was confirmed in the

meeting with Smuckler, Goulet, Koch, and Human Resources.  Compl. ¶ 156.  The Supreme Court

has stated that a suit against an individual in his official capacity is essentially a suit against the

entire entity.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 ("[O]fficial-capacity suits . . .

generally represent only another way of pleading an action against an entity of which an officer is an

agent.").  NYRA is therefore also subject to suit based on the potential constitutional violations of

the individual NYRA Defendants acting in their official capacities.

Based on the foregoing, the Court concludes that NYRA is a state actor within the meaning

of § 1983 and is subject to suit for alleged constitutional violations.

**2. First Amendment Violations**

Plaintiff argues that his First Amendment right to freedom of speech was violated in

retaliation for reporting the presence of alcoholic beverages that Goulet had brought into the

detention barn.  Compl. ¶¶ 75, 155.  Defendants argue that Plaintiff's Complaint does not plausibly

demonstrate that his speech was protected from retaliation under the First Amendment because it

does not show that he was speaking as a public employee "on a matter of public concern."  NYRA

Mem. at 7.

"Public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  In order to determine whether Plaintiff has raised even the "possibility" of a First Amendment claim, the threshold question the Court must consider is "whether the employee spoke as a citizen on a matter of public concern."[7]  Id. at 418 (citing Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Illinois,, 391 U.S. 563, 568 (1968)).  If the answer to this inquiry is in the affirmative, then the possibility of a First Amendment claim arises.  Garcetti, 547 U.S. at 417.

Plaintiff has failed to raise a plausible allegation that NYRA violated his freedom of speech under the First Amendment.  Plaintiff has pleaded that he was a supervisor of the barn crew during the 2009 employment season, and that the duties of the barn crew are generally to maintain the barns' cleanliness and functional condition.  Compl. ¶¶ 17-18.  Plaintiff claims that he reported the fact that alcohol beverages were in the detention barn and break room, which is strictly prohibited, and that he was terminated as a result.  Id. ¶¶ 75-79.  Since Plaintiff was a supervisor whose general duties included maintaining the barn in an acceptable condition, it follows that such duties included reporting any potential violations of regulations that establish what is and is not an acceptable condition of the barn.  By reporting the presence of alcohol in the barn, then, Plaintiff was fulfilling his duty as an employee and a supervisor of the barn crew by reporting a violation of the NYRA

---

[7] If a court finds that the employee spoke as a citizen on a matter of public concern, the court must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  Garcetti, 547 U.S. at 418.  Because Plaintiff has not satisfied the first prong of the analysis necessary to raise the possibility of a First Amendment claim, the Court does not reach the second inquiry.

alcohol policy.[8]  See Huth v. Haslun, 598 F.3d 70, 74 (2d Cir. 2010) (finding failure to raise First

Amendment claim by supervisor in the New York State Thruway Authority, who was acting

pursuant to her official duties and did not address a matter of public concern in reporting an

employee's complaints and concerns about the actions of other employees); Paolo v. Spada, 372

Fed. Appx. 143, 144 (2d Cir. 2010) (finding state trooper's complaints about supervisor's "alleged

mismanagement and potentially wrongful conduct" were made pursuant to official duties because

troopers are required to report potential wrongdoing).

     Furthermore, Plaintiff has failed to show that his speech was addressing a matter of public

concern.  As another district court has stated:

> Speech will be fairly characterized as a matter of public concern if it relates to any
> matter of political, social or other concern to the community. However, speech that
> relates primarily to matters of personal interest or internal office affairs, in which the
> individual speaks as an employee rather than a citizen, will not support a First
> Amendment retaliation claim.

Kelly v. City of Mount Vernon, 344 F. Supp. 2d 395, 402 (S.D.N.Y. 2004) (citing Connick

v. Myers, 461 U.S. 138, 147 (1983); see also White Plains Towing Corp. v. Patterson, 991

F.2d 1049, 1058 (2d Cir. 1993); Cahill v. O'Donnell, 75 F. Supp. 2d 264, 272 (S.D.N.Y.

1999)).  Plaintiff claims that the existence of alcoholic beverages is a matter of public

---

[8] Plaintiff also argues that he was not acting pursuant to his job duties because he reported
the presence of alcohol to both security and the integrity counsel, the latter of which was outside
NYRA's "normal internal grievance structure."  Pl. Mem. at 5-6.  This argument is unavailing.
Although the integrity counsel is an independent entity, its sole purpose is to "ensure the integrity of
the franchised corporation, its officers and employees, and it operations."  N.Y. Racing Law §
206(5).  While it is not subject to direct control by NYRA, its function is to investigate and address
incidents such as the one Plaintiff reported.  See id.  Despite Plaintiff's insistence to the contrary,
complaining to the integrity counsel is no different from filing a complaint within NYRA's internal
grievance structure.  In light of the function of the integrity counsel, it follows that Plaintiff would
report an alcohol policy violation directly to the integrity counsel as well as security in the course of
his official duties as a supervisor of the barn.

concern.  Compl. ¶¶ 153, 154.  However, Plaintiff's Complaint also states that the

prohibition on alcohol in the barn was an internal policy of NYRA designed to "ensure the

integrity of racing and wagering."  Id. ¶ 154.  This speech cannot be considered a matter of

public concern because it relates to Plaintiff's "personal situation" with the barn he is

charged with maintaining, and it does not relate to any public concern, political, social, or

otherwise, of the community.  Huth, 598 F.3d at 75; see also Kelly, 344 F. Supp. 2d at 403-

05 (finding that even where complaint alleged "serious misconduct" reported by plaintiff

against his supervisors, "the fact that plaintiff was mistreated . . . does not automatically give

him a federal claim").  Plaintiff has failed to show that in reporting a single violation of

NYRA's alcohol policy he "sought relief against pervasive or systemic misconduct by a

public agency or public officials," or that his action "was part of an overall effort to correct

allegedly unlawful practices or bring them to public attention."  Huth, 598 F.3d at 75

(internal citations and quotations omitted).  Accordingly, Plaintiff's speech at issue here is

not protected by the First Amendment.

Based on this analysis, Plaintiff cannot plausibly show entitlement to relief based on his First

Amendment retaliation claim under § 1983, and it must be dismissed as against the NYRA

Defendants.  However, this holding does not preclude Plaintiff from proceeding with his remaining

federal and state law claims against the NYRA Defendants.  See Compl. ¶¶ 160-65.

**B. Title VII and Human Rights Law Violation Claims Against Defendant IBEW**

Defendant IBEW moves to dismiss Plaintiff's Complaint with respect to the claims against

the Union because (1) Plaintiff failed to name it in the administrative complaint filed with the

NYDHR and EEOC; and (2) Plaintiff has failed to state a claim for which relief may be granted.

IBEW Mot. Dismiss at 2-4.

Title VII prohibits labor unions from "discriminat[ing] against[] any individual because of his race . . . or national origin" or refusing "applicants for membership . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(c).  The *prima facie* case for establishing discrimination under Title VII, § 1981, and the NYHRL is the same.  See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir.2010); Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).  "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  More specifically, Plaintiff must demonstrate that: (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected despite his qualifications; and (4) after the rejection, the position remained open and the employer continued to seek applicants from persons of similar qualifications. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Once the plaintiff has established a *prima facie* case under this framework, the burden shifts to the defendant employer to advance a legitimate nondiscriminatory reason for the employee's rejection.  Id.  If the defendant satisfies this burden, the plaintiff is afforded a reasonable opportunity to show that the defendant's reason is actually pretext for an underlying discriminatory reason.  Id. at 804.

"A showing of disparate treatment . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation omitted).  "In order to demonstrate disparate treatment, a plaintiff must show that he was similarly situated in all material respects to the

individuals with whom he seeks to compare himself." Id. (internal quotation omitted).  In showing

that he was similarly situated to these other individuals, Plaintiff's circumstances "need not be

identical" to those of the other individuals, "but there should be a reasonably close resemblance of

facts and circumstances." Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001) (citation

omitted); see also Beachum v. AWISCO New York, 09 CIV. 7399, 2011 WL 1045082, at *7

(S.D.N.Y. Mar. 16, 2011).

   Here, the Court finds that Plaintiff has sufficiently pled a *prima facie* case of disparate

treatment.  Plaintiff has pleaded that he belongs to a racial minority as a Mexican.  Compl. ¶ 3.

Plaintiff claims that he was "promised for about three years that he could join the union.  Malick

Volk, the shop steward [for the union], suggested it to him, and Joe Strauss recommended him.

Strauss said he talked to both Charles Wheeler and Mike Murray about it." Id. ¶ 33; IBEW Mem. at

2.  Plaintiff states that he "tried to get in the union" for three years but was denied membership each

time.  Compl. ¶ 35.  In 2009, when he was denied membership a third time, Plaintiff asserts that

"two white males became union members at the M-2 level, the same level plaintiff would have been

if permitted to join the union." Id. ¶ 36.  Furthermore, Plaintiff was a highly regarded worker at the

racetrack and was promoted to a supervisory position. Id. ¶¶ 23-25.  The Caucasian employee who

previously held Plaintiff's position at the race track was a member of the Union at the M-2 level,

and all the Union member employees from Saratoga Race Course are white.  Compl. ¶¶ 32-37;

IBEW Mem. at 4.

   Although it is unclear whether the employment positions held by the two Caucasian Union

members were granted Union memberships the same year Plaintiff applied, it is sufficient that

Plaintiff has alleged that the previous individual in his position was Caucasian and a Union member,

and that the Union was continually accepting members in 2009.  It may be reasonably inferred from the Complaint that Plaintiff was qualified to become a Union member, was denied membership in the Union, and that the Union accepted other equally qualified Caucasian employees into the union the same year Plaintiff was denied for the third time.  Plaintiff has therefore carried his initial burden of presenting a *prima facie* case of discrimination.

Defendant IBEW contends that there was a legitimate nondiscriminatory reason for Plaintiff's denial of Union membership – namely, that Plaintiff was not a full-time employee and that Plaintiff did not possess a driver's license.  IBEW Mem. at 3-4.  IBEW claims that these requirements have been included in the Union's collective bargaining agreement ("CBA") since 1986.  Id.  However, IBEW does not provide an affidavit or any other supporting documents as evidence including the CBA or a reference to this provision in the CBA, such as an application posting for Union membership, to support its claim.  See id.

> The burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.

Burdine, 450 U.S. at 254-55.  However, Defendant IBEW's factual allegations are not entitled to an assumption of truth.  The Court must accept as true all well-pleaded factual allegations made by the Plaintiff on a motion to dismiss, and "draw all inferences in the light most favorable" to the non-moving party.  NYSE Specialists, 503 F.3d at 95.  Therefore, Defendant has not sufficiently advanced a nondiscriminatory reason for denying Plaintiff membership in the Union, and Plaintiff

has advanced a plausible claim for entitlement to relief for his discrimination claims against Defendant IBEW.

Defendant IBEW also claims that the Complaint should be dismissed because the Union was not a party named in his administrative complaint.  IBEW Mem. at 2-3.  "A prerequisite to commencing a Title VII action against a defendant is the filing with the EEOC or authorized state agency of a complaint naming the defendant."  Johnson v. Palma, 931 F.2d 203, 209 (2d Cir. 1991) (citing 42 U.S.C. § 20002-5(e)).  There is, however, an exception to the general rule that a plaintiff must name in the administrative complaint every party against whom the suit will eventually be brought.  Palma, 931 F.2d at 209.  "This exception, termed the 'identity of interest' exception, permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge."  Id.  The Second Circuit has instructed courts to consider (1) whether the role of the unnamed party may be ascertained by the complainant at the time of filing the EEOC complaint; (2) whether, in the particular circumstances, the interests of a named party are so closely related to the unnamed party's that it would be unnecessary to include the unnamed party in the EEOC; (3) whether the unnamed party would be prejudiced by a complainant's failure to name that party in the EEOC complaint; and (4) whether the unnamed party has represented to the complainant that its relationship with the complainant is through the named party.  Id. at 209-10.

Applying this test to the present case, the Court concludes that Plaintiff was not required to name Defendant IBEW in the EEOC administrative complaint.  First, Plaintiff states that his main reason for naming IBEW as a Defendant in the present Complaint was that NYRA defended itself against Plaintiff's claims "by trying to shift the blame to the union" during a conference with the

-24-

New York State Division of Human Rights.  Pl. Opp'n M.D. at 23.  Second, the interests of the

Union are closely related to those of NYRA, because a union is significantly related to the

organization from which its member employees originate.  Third, the Union is not prejudiced by

Plaintiff's omission of it in the administrative complaint, as IBEW's involvement was mentioned

several times throughout that complaint. Pl. Mem. at 23.  Fourth, as the Union alleges, NYRA must

classify a worker as "permanent" rather than "seasonal" so that an employee can qualify for

membership in the Union.  IBEW Mem. at 3.  The Union thus gains its members based on the

policies and practices that NYRA uses to determine the seasonal or permanent status of employees.

Plaintiff could reasonably infer from these circumstances that his initial relationship with the Union

is through, and dependent on, NYRA.  Based on this analysis, the Court holds that Plaintiff is

entitled to the identity of interest exception, and did not need to name the Union as a party in the

administrative complaint.

Defendant IBEW also argues that the Court should decline to exercise supplemental

jurisdiction, pursuant to 28 U.S.C. 1367, over the New York State Human Rights Law claim.

Because Plaintiff has demonstrated a *prima facie* case of a human rights violation based on an

unlawful discriminatory practice pursuant to N.Y. Exec. Law § 296, and the closely related federal

claims brought under § 1981 and Title VII have not been dismissed, the Court need not address this

argument.  Defendant IBEW's Motion to dismiss must be denied because Plaintiff has pleaded

sufficient facts to plausibly raise an entitlement to relief under Title VII, § 1981, and the NYHRL.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that NYRA Defendants' Motion to dismiss Plaintiff's First Amendment claim

-25-

(Dkt. No. 21) is **GRANTED**; and it is further

ORDERED, that Defendant IBEW's Motion to dismiss (Dkt. No. 23) is **DENIED**; and it is

further

ORDERED, that the Clerk of the Court serve copies of this Order on the parties.

**IT IS SO ORDERED**.


DATED:      August 29, 2011
            Albany, New York




_____
Lawrence E. Kahn
U.S. District Judge